(No. 46644.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. LYMAN A. MOORE, Appellant.

*Opinion filed January 30, 1975.—Rehearing denied March 24, 1975.*

WARD, J., took no part.
SCHAEFER, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Matthew J. Beemsterboer and Dale W. Broeder, Assistant Public Defenders, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B. Zagel, Assistant Attorney General, of Chicago, and Patrick T. Driscoll, Jr., and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

After an evidentiary hearing in the circuit court of Cook County, "post-conviction" relief was denied to defendant, Lyman Moore. We permitted a direct appeal to this court (50 Ill.2d R. 302(b)) in which defendant contends that the evidence adduced establishes that he was denied due process of law at his jury trial.

In 1964 the defendant was convicted of the murder of a Lansing, Illinois, tavern owner, Bernie Zitek. He was sentenced to death. Defendant's direct appeal to this court was consolidated with an appeal from a judgment denying post-conviction relief. This court affirmed his conviction and sentence with one justice dissenting. (*People v. Moore,* 42 Ill.2d 73.) On *certiorari* the United States Supreme Court, in a 5-to-4 decision, affirmed the conviction but reversed the death sentence. (*Moore v. Illinois,* 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562.) After the cause had been remanded to the circuit court for resentencing, counsel for defendant presented a "Petition" seeking a new trial. It was specifically based on an alleged constitutional violation that the State had failed to disclose to defendant's trial counsel a statement signed by Virgle Sanders for use during his cross-examination. Defendant maintained that had this disclosure been made he would have been able to establish that Sanders had mistakenly identified him as the man known as "Slick" who had admitted the killing of Zitek to Sanders.

The trial court summarily denied the "Petition," and defendant unsuccessfully sought leave to file an original action for writ of *mandamus* in this court. (50 Ill.2d R. 381.) However, in the exercise of this court's supervisory authority and in view of the extraordinary circumstances of the case, we directed that defendant's "Petition" be treated as a post-conviction petition, that the State file an answer thereto and that an evidentiary hearing be conducted. Following the evidentiary hearing, the trial court

sustained the State's motion to dismiss and this appeal followed. Defendant is presently serving a sentence of 60 to 100 years in the penitentiary for the Zitek murder.

The background facts to this appeal are extensively reported in the opinions of this court and the United States Supreme Court and will be set forth only to the extent necessary for consideration of the issue raised. At the trial Sanders testified that on April 27, 1962, two days after the shooting, he was sitting in the Ponderosa Tap with a man he knew as "Slick" and whom he identified as defendant. This man told Sanders that he had shot a bartender in Lansing. On cross-examination Sanders admitted he told a relative that he did not know anything about the murder when she suggested he contact the police, and he told her that he "didn't want nothing to do with it."

In the first post-conviction petition, defendant claimed that Sanders' testimony was the most damaging evidence against him and that it was perjured. Moreover, he maintained that on April 30, 1962, Sanders had given a written statement to police indicating that he had met "Slick" about six months prior thereto. Defendant asserted that Sanders could not have met him at the latter time for he was not released from Federal custody until March 1962.

Sanders testified at the evidentiary hearing conducted in regard to the first post-conviction petition, and he reiterated his reluctance to become involved in the case as he described the circumstances at the time the police first talked to him about the matter. Apparently, the police had contacted him when it was learned that he was a frequent patron of the Ponderosa Tap where Zitek's killer and another may have gone after the murder.

During this proceeding Sanders substantiated defendant's charge that he had signed the statement on April 30, 1962, indicating he had previously met "Slick." He also testified that he had first become acquainted with "Slick"

in a local tavern before Christmas, 1961, when "Slick" was involved in an altercation with another patron, William Thompson. Sanders claimed that no one ever méntioned that defendant had been incarcerated in 1957 and had not been released until March 1962, although the authorities were aware of this fact. Defense counsel then asked Sanders:

> "Q. And did you tell me and also later on, did you tell the policeman from the State's Attorney's office that if you had known that this fellow, Lyman Moore, was in the Federal penitentiary until March 4, 1962, you would definitely not have identified him as being Slick that you knew?
>
> A. If he's in jail, it would have been impossible to be the same man."

This court rejected defendant's contention that Sanders' testimony was perjured, and we observed that any discrepancy merely indicated testimonial inconsistency. We further held that defendant had failed to establish that the State suppressed material evidence favorable to defendant which he had requested. 42 Ill.2d 73, 80-81.

The majority of the United States Supreme Court, in reviewing the aforesaid colloquy observed: "Unquestionably, as the State now concedes, Sanders was in error when he indicated to the police that he met Moore at Wanda and Del's [tavern] about six months prior to April 30, 1962. Moore's incarceration at Leavenworth until March shows that conclusion to have been an instance of mistaken identity. But the mistake was as to the identification of Moore as 'Slick,' not as to the presence of Moore at the Ponderosa Tap on April 27. 'Sanders' testimony to the effect that it was Moore he spoke with at the Ponderosa Tap in itself is not significantly, if at all, impeached. ***' " (408 U.S. 786, 795-96, 33 L. Ed. 2d 706, 713-14.) And, after consideration of the other positive identifications of defendant as the killer and the one in the Ponderosa Tap, the majority concluded "in the light of all the evidence, that Sanders' misidentification of Moore as Slick was not

material to the issue of guilt." (408 U.S. 786, 797, 33 L. Ed. 2d 706, 714.) The four dissenting justices of the United States Supreme Court construed Sanders' testimony as indicating that it would have been impossible for Moore to have been the man who spoke to him at the Ponderosa Tap (408 U.S. 786, 804, 33 L. Ed. 2d 706, 719) and that such evidence was material to the defense (408 U.S. 786, 807 n.4, 33 L. Ed. 2d 706, 720 n.4).

Subsequent to that court's opinion, defense counsel contacted Sanders and obtained his statement, which was appended to the "Petition." During the recordation of this statement, defense counsel explained to Sanders the interpretations given to his prior testimony by the United States Supreme Court. Sanders concluded that the majority construction was wrong, that the man in the Ponderosa Tap was "Slick," not the defendant, that he had met "Slick" at Wanda and Del's tavern and that "Slick" and William Thompson had almost fought in that bar. Sanders also said he was 6 feet 1 inch in height and "Slick" was about the same height or possibly an inch less.

At the evidentiary hearing conducted in March, 1974, in accordance with our directive, Sanders testified he had not previously seen defendant standing, that defendant was too short to be "Slick," and that it was "Slick" who talked about the killing in the Ponderosa Tap. After standing near defendant, Sanders further testified that "Slick" was at least 6 feet in height and defendant was 3 or 4 inches shorter. On cross-examination this witness said that the name "Slick" was commonplace in bars when an individual's name was unknown and that he called many men by that name.

In arguing that he was denied due process of law, defendant alludes to the interpretation given to Sanders' testimony at the first post-conviction hearing by the majority of the United States Supreme Court and its conclusion that such testimony was not material to the issue of guilt. He argues that the majority interpretation

has now been refuted by Sanders' subsequent statements. Defendant maintains it is now established that Moore was not "Slick" and that it was the latter who confessed the killing to Sanders. Thus he contends that this evidence was material to the issue of guilt, that Sanders' repudiation of the trial identification requires reversal of his conviction and, we assume, that the cause be remanded for a new trial.

It is axiomatic that in post-conviction proceedings a defendant bears the burden of establishing a substantial constitutional deprivation. (*People v. Madison,* 56 Ill.2d 476, 490; *People v. Newberry,* 55 Ill.2d 74, 75.) While challenges as to the sufficiency and competency of the evidence are not properly cognizable in such proceedings (*People v. Dunn,* 52 Ill.2d 400, 402; *People v. Southwood,* 49 Ill.2d 228, 229; *People v. Vail,* 46 Ill.2d 589, 591), due to the extraordinary circumstances of this case we have again reviewed the record.

Sanders specifically stated in his trial testimony that a person in the Ponderosa Tap told him that he shot a bartender in Lansing and that person was the defendant. While Sanders was unable to recall the precise substance of the conversation at the two post-conviction hearings, he has, nearly a decade after the trial and after repeated reluctance to become involved in this case, unequivocally disavowed his trial identification of defendant as the one who made this incriminating admission at the Ponderosa Tap. However, he has reaffirmed his belief that he met "Slick" in Wanda and Del's tavern when an altercation developed with William Thompson.

In summarizing the evidence the majority of the United States Supreme Court stated "but nothing served to destroy the two-witness identification [Hill and Powell] of Moore as Zitek's assailant, the three-witness identification [Sanders, Joyce and Fair] of Moore as present at the Ponderosa Tap, the two-witness identification [Joyce and Fair] of Moore as one of the men who requested and

obtained a ride from the Ponderosa in Dolton to Harvey, Illinois, and Fair's testimony as to the admission made on that ride." (408 U.S. 786, 798, 33 L. Ed. 2d 706, 715.) The only factor that has now changed from this recapitulation is Sanders' identification of Moore as the person at the Ponderosa Tap.

The positive identification of the waitress, Patricia Hill, who observed defendant not only prior to the shooting but also from a distance of 6 feet under good lighting conditions at the time of the murder, remains unchallenged. Henley Powell, who also saw the shooting, identified Moore, and this court as well as the United States Supreme Court found that there was nothing to indicate that his testimony was false.

In regard to the incident in the Ponderosa Tap, the record, as presently constituted, does not diminish defendant's identification by Joyce, the Ponderosa bartender. Nor has the testimony of Fair, the owner of the Ponderosa Tap, been challenged. The four dissenting justices of the United States Supreme Court sought to lessen the credibility of Fair's identification of Moore by noting that he had been drinking the entire afternoon. However, examination of Fair's testimony indicates that he had only two drinks that afternoon and both of these were consumed with defendant and his companion "Barbee" during stops at two taverns on their way to Harvey, Illinois. It is to be further gathered from Fair's testimony that he was with defendant in these establishments for nearly one hour and that during their ride, at which time another admission was made, defendant sat next to Fair in the latter's car.

In relation to Sanders' credibility, it is of significance that Sanders maintained that he was able to recall when he met "Slick" because "Slick" had been involved in an altercation with one William Thompson at Wanda and Del's tavern. At the first post-conviction hearing, Thompson and the operator of Wanda and Del's tavern, Delbert Jones, corroborated the fact that this altercation had

ensued and that the person known as "Slick," who was involved in the fracas, was actually James Watts. The dissenting justices of the United States Supreme Court twice observed that Watts and defendant looked very much alike and "Sanders' testimony at the post-conviction hearing indicates that it was Watts who bragged about the murder not [defendant]." (408 U.S. 786, 805, 33 L. Ed. 2d 706, 719.) The dissenting justice of this court reached the same conclusion in our prior opinion. 42 Ill.2d 73, 88.

Examination of a police photographic exhibit showing "Slick" Watts was denied admission by the trial court at the first post-conviction proceeding. Defendant's motion to supplement the record by including said picture was granted by this court in defendant's previous appeal. This photograph indicates that Watts and defendant are each about the same height. If any credence is to be given to Sanders' subsequent testimony regarding "Slick" as being 6 feet tall, then James Watts must also be eliminated from consideration as the elusive "Slick" who conversed with Sanders in the Ponderosa Tap over 12 years ago because Watts would also be too short. This would refute Sanders' consistent position that he had met "Slick" at Wanda and Del's tavern when "Slick" Watts argued with William Thompson.

For this reason we are of the opinion that the pertinent matters contained in Sanders' statement given to defense counsel after the decision of the United States Supreme Court and his testimony at the second post-conviction hearing lack that quantum of credibility which would permit this court to consider granting relief to defendant. We therefore adhere to the interpretation of the majority of the United States Supreme Court given to Sanders' testimony at the first post-conviction hearing. And even if we consider the present confusing posture of Sanders' identification, we find that there is other ample evidence, as previously set forth, which establishes defendant's guilt beyond a reasonable doubt.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

MR. JUSTICE WARD took no part in the consideration or decision of this case.

MR. JUSTICE SCHAEFER, dissenting:

This case now stands on a very different footing than it did in 1972, when the Supreme Court of the United States, in a five to four decision, affirmed the conviction of the defendant for the murder of Bernard Zitek. The primary focus centered then, as it does now, upon the testimony of the witness Sanders that "two days after the murder, he was in the Ponderosa Tap and that a customer there, whom Sanders identified as 'Slick,' remarked to Sanders that it was 'open season on bartenders' and that he had shot one in Lansing. At the trial Sanders identified Moore as the man who was in the Ponderosa Tap on April 27." *Moore v. Illinois* (1972), 408 U.S. 786, 789, 33 L. Ed. 2d 706, 710, 92 S. Ct. 2562.

The ambiguity that existed as to the meaning of Sanders' testimony at the first post-conviction hearing has now been removed. As the present opinion of this court states, Sanders "unequivocally disavowed his trial identification of defendant as the one who made the incriminating admission." In other words, it is now clear that it was not, as the jury had been told, the defendant Moore who admitted the murder. Instead, the admission was made by a man known as "Slick," whom Sanders had first met while the defendant Moore was in the penitentiary at Leavenworth.

Sanders has testified that he had first met the man he knew as "Slick" in Wanda and Dell's Tavern in the fall of 1961, when "Slick" had an altercation with William Thompson. This testimony is not a recent fabrication. The police had Sanders' statement to that effect on April 30,

1962, a full six months before Moore was arrested for an unrelated offense, on October 31, 1962. Both Thompson and Delbert Jones, the proprietor of Wanda and Dell's, have testified that such an altercation occurred, and that the man involved in it was not the defendant Moore, but a man named James Watts, who was known as "Slick."

The failure of the police to disclose that it was not Moore who had confessed to the killing may have been accidental, or it may not. From the outset of the investigation, the police knew of the existence of Sanders and of the admission made to him. They knew also of the existence of the witnesses Joyce and Fair. The defendant Moore appeared in numerous lineups after his arrest, but neither Sanders nor Thompson was taken to any of those lineups. Thompson was not called as a witness at the trial, but the police had shown him a picture of the defendant Moore, and they knew that he had said that Moore was not the man named Slick whom he knew. Sanders did not see the defendant until the trial in May of 1964. For some reason the State resisted efforts, both at the trial and at the post-conviction hearing, to establish that neither Joyce nor Fair saw the defendant from the time of the incident at the Ponderosa Tap until the trial. When Sanders first saw Moore at the trial, he protested that the man he knew was 30 or 40 pounds heavier than Moore. His misgivings were allayed, however, by the police officer's reply: "Well, you know how jailhouse beans are." At the trial, Fair was able only to say that the defendant Moore "looks like one of the men" who was in the Ponderosa Tap. A responsible offer to prove that when Joyce first saw the defendant Moore at the trial he said, "He sure looks different," was rejected.

Despite the fact that additional evidence has demonstrated that Sanders' post-conviction testimony was misunderstood, this court would now sustain the conviction by mounting, *sua sponte,* an attack on Sanders' credibility. That attack relates to the height of James E. "Slick"

Watts, and it is rebutted by the arrest records of the Chicago Police Department.

In this case the State of Illinois knowingly permitted testimony which it knew to be false to remain uncorrected. There is no doubt that it might have affected the outcome of the trial, for it involves attribution to this defendant of a confession that someone else made. It will not do to say that there is no violation of the Constitution because it was not proved that the falsity was known to the prosecutor who tried the case. The actions of police officers are actions of the State of Illinois for all other fourteenth amendment purposes, and there is no reason why a different rule should be applied when life or liberty depends upon the outcome of a trial.